

# Missouri Court of Appeals

## Southern District

### Division One

SHAWN C. HANNA,            )
                                    )

    Movant-Appellant/Cross-Respondent,   )

                                      )

    v.                                )     Nos. SD35632, 35646

                                      )

STATE OF MISSOURI,          )     **Filed:  October 29, 2019**

                                      )

    Respondent-Respondent/Cross-Appellant.  )

### APPEAL FROM THE CIRCUIT COURT OF HOWELL COUNTY

Honorable William E. Hickle, Special Judge

### <u>AFFIRMED</u>

The motion court granted in part Shawn C. Hanna's ("Movant's") Rule 29.15[1] post-conviction relief following an evidentiary hearing.  The State appeals that partial grant of relief and Movant cross-appeals the denial of relief on other grounds.  We affirm the partial grant of relief.  Because of that affirmance and the relief granted of a new trial, we do not address Movant's other claims of error.

---

[1] All rule references are to Missouri Court Rules (2019).

Movant was convicted of killing his father, Ralph Hanna.[2]  In its Findings of Fact, Conclusions of Law, and Judgment, the motion court noted that this case was tried to a jury three times -- the first and second trial ended in a hung jury.  In the point relevant to this decision, Movant claimed that his trial attorneys were ineffective for not interviewing, investigating, subpoenaing, and calling Nadia Black to testify.  After noting the standard it used to ascertain whether counsel was effective, the motion court correctly noted that Missouri courts require Movant to show:  "(1) the witness could have been located through reasonable investigation; (2) the witness would have testified if called; and (3) the testimony would have provided a viable defense."  ***Williams v. State***, 8 S.W.3d 217, 219 (Mo.App. E.D. 1999).

The motion court found the following with regard to Ms. Black:[3]

> [S]he lived due south of the Hanna residence at the time of Ralph Hanna's death, directly across Highway N.  The morning of November 16, 2003, she was in her bed reading a book. She heard a loud shot fired at 8:30 a.m. She immediately looked at her clock and it said 8:30. She either heard one or two shots, testifying, "So I wasn't sure if I heard one or two very close together. I think just one because the first one seemed louder, but I'm not positive." The sound of the shot came from the north. She testified, "I just thought well, somebody is off hunting to the north, but I thought they're awfully close because it was very loud." She lived on ten acres with road frontage to Highway N, directly across the highway from the Hanna home. Upon hearing the shot, she testified, "I chirped up and am thinking that's across the street, that's from the north. And it was extremely loud."
>
> Ms. Black was questioned repeatedly in her deposition concerning the time that she heard the shot, and she answered as follows:
>
>> "I remember looking immediately at my clock, and it said 8:30. It could have been 25 after or 35 after, but 8:30 is what I saw on my clock."

---

[2] Movant was convicted of murder in the first degree and sentenced to life without the possibility of parole.

[3] The motion court's findings and conclusions are set forth below without further attribution and all internal citations to the record have been omitted.

"It was a little round Westclock beige colored . . . [t]o my left on the night table. . . . But I looked immediately, and it was set on 8:30. As I say, it was a mechanical clock, not electric, so it could have been 25 after, 35 after, but it was 8:30."

["]Q. Is it possible that it could have been sooner than 8:30? A. I don't think so. My clocks were rarely ever wrong."

"I'm not – can't be possible positive that it was exactly 8:30 it could have been a couple minutes either way."

"I'm certain it was 8:30. But being absolutely honest and knowing a lot of mechanical scientific things, it wasn't an anatomic [sic] clock. It wasn't precise. It could have been a minute or two off and still said 8:30."

Ms. Black testified after the shooting incident involving Mr. Ralph Hanna, two law enforcement officers came to interview her. Ms. Black told police she heard one shot and an echo or two or three shots very close together. Ms. Black told police the shot was coming from the north. When asked whether she was ever contacted by Movant[']s trial attorneys, she answered,

> No, I never was. The only people who ever contacted me regarding this were the two officers who came I don't know if it was that day, probably the next day. And I don't remember if they were county or state. But they were the only ones who ever contacted me.

Ms. Black still lived in the same house at the time of Movant's 2010 jury trial. Ms. Black would have been willing and able to testify at Movant's trial had she been contacted.

At the postconviction relief hearing, Ms. Anthony [(one of Movant's trial attorneys)] testified she recalled Ms. Black told police she heard a shot at 8:30 a.m. Ms. Anthony's recollection was Ms. Black was not confident of her timing. Ms. Anthony agreed that Ms. Black gave a different time than Mr. Fann testified to at trial. Ms. Anthony acknowledged the timeline was very important to Movant's defense at trial. Ms. Anthony testified the State had inconsistent timelines from other witnesses as well in the case. She asserted that she had never talked to Ms. Black, but that her investigator had talked to Ms. Black. Ms. Anthony's recollection is that Ms. Black was not confident about the time that she heard the shot. Ms. Anthony testified that she asked her investigator to

gather some facts about Ms. Black's statement and that she considered those facts that the investigator gathered and reported to her.

The motion court noted the contradictions in Ms. Anthony's testimony at the evidentiary hearing with statements made by Ms. Anthony on the record to the trial court on December 17, 2010, hours after the jury returned its guilty verdict:

> MS. ANTHONY: Obviously last night I did a lot of soul searching and thinking about my performance in the case . . . During the pendency of [Movant's] case, my office had no investigator. We were the only office in the entire state that had no investigator when this case started. I then got a part-time investigator who I was not allowed, under the state rules, to have to work overtime. I failed to request special funds for an investigator on this case. My part-time investigator made multiple trips to Poplar Bluff to investigate this case, but the reality is the attorneys in the case ended up doing a lot of the leg work, or trying to do the leg work, in addition to handling their cases because, by the time a part-time investigator drove to Poplar Bluff, his time was gone.
> Additionally, I cannot find any place in the file where anyone talked to Nadia Black who was a witness that the police officers spoke to, who said that she heard the shots at 8:30. I think the timeline is critical. I didn't get the case until 2007, but that is no excuse for me. I should know and be able to tell this Court whether or not Nadia Black is even alive. And if she would have been unavailable, and therefore her hearsay statements would have been admissible, and that is a failure on my part.

The motion court found credible the statements made by Ms. Anthony on December 17, 2010, and further found the statements at the evidentiary hearing lacked credibility:

> Hours after the jury verdict, at the time that the trial was fresh on her mind, Ms. Anthony stated clearly as an officer of the court that she simply failed to investigate Ms. Black as a potential witness and did not even know whether Ms. Black was even alive. Her recollection more tha[n] five years later at the time of the April 29, 2016 postconviction relief hearing that she had talked to her investigator about the merits of Ms. Black as a witness appears to be inaccurate, and the Court so finds.

Further, the motion court found "[t]he time of the shooting was crucial because of the activities which the State asserted necessarily took place after the shooting." Further:

4

The 8 a.m. time of shooting was important for two reasons. First, the State argued it was evidence of murder rather than an accident, because of the unexplained delay by Denise Hanna in calling for help. If the shot was fired at 8 a.m., then she delayed forty minutes before calling the police at 8:40 a.m. Second, it allowed time for Movant to return to the Hanna home on foot, get in the white vehicle with his mother, be transported to the Cates driveway, and drive to the Eads' home in Williamsville. The drive from the Hanna house to the Eads' house in Williamsville using the most direct route was 20 to 25 minutes. The trip would have required an unknown additional period of time because Michael Cates observed the Mercedes drive west on Highway N after it left his driveway, which is in the opposite direction of both Ellsinore and Williamsville. No evidence of an alternate route was given at trial, but it would have required more time since the Mercedes drove west when leaving the Cates driveway, while Williamsville is situated to the east.

If the shooting did not occur until 8:30 a.m., then the call by Denise Hanna within ten minutes at 8:40 a.m. would not be as suspicious. Further, if the shooting did not occur until 8:30 a.m., it would be nearly impossible for Movant to accomplish all of the above activities and drive to the Eads house by 9:00 a.m. or shortly thereafter. Moreover, if the shooting did not occur until 8:30 a.m., then someone other than Movant was likely the shooter, given that the State asserted that Movant was present at the vehicle exchange in the Cates driveway between 8:15 a.m. and 8:30 a.m.

Both attorneys emphasized the importance of the time of death in their opening statements. Prosecuting attorney Kevin Zoellner told the jury:

> At eight o'clock that morning, Donald Fann is getting ready to sit down to watch some program on his TV. I guess Donald is a creature of habit. Eight o'clock every morning on a Sunday he sits down. He thinks it was a news program but he doesn't remember for sure what type of program but it was at the top of the hour. And he knows it was eight o'clock because, Donald is a little bit of a character he strikes me. He describes in his room that he's got lots of clocks . . . He's got three Dale Earnhardt clocks right there in his room. And he'll tell you right at eight o'clock he heard a loud gunshot . . . And it startled him so bad right at eight o'clock, what did he do? He popped up and headed out the front door to look to see where that was at . . . It was right at eight o'clock. Okay?
>
> About eight-thirty, a whole half-hour later, Denise Hanna who apparently is at home you'll learn, apparently at home making a birthday cake for Ralph. That's what she says, claims she's doing. But it's not till eight-thirty that anybody ever gets a call for help . . . So from eight to eight-

5

thirty Ralph is dead in his yard whil[e] Denise is baking a cake. Well, that's not actually what's happening because remember the Cates? Michael and Jesse Cates saw that car up there.

Donna Anthony's opening statement includes the following:

> Well, on the 17th, some of the deputies decide to do something called canvassing the neighborhood and they go and they talk to various neighbors to see what they heard and what they saw. And they find neighbors who did see some suspicious things. They talk to one lady who said around 8:30-
> MR. ZOELLNER: Your Honor, could we approach please? (Counsel approached the bench . . .)
> MR. ZOELLNER: Your Honor, I'm going to object to the hearsay statements of any witness that's not been endorsed as a witness or intended to be called. I'm not sure who this lady is that they're referring to but as you know, they've endorsed just one witness who was not a neighbor at that time and to try and get in hearsay statements from officers about different times when they're offering it for the truth of the matter.
> MS. ANTHONY: I'm not offering it for the truth of the matter.
> THE COURT: What purpose?
> MS. ANTHONY: I'm offering it for the purpose of the information that they had to go on for their subsequent investigation.
> MR. ZOELLNER: Judge, it's being offered for the truth of the matter because when she stands up in closing argument, she's going to say, "Neighbors, neighbors said 8:30; this timeline is wrong." You've got to bring these people in, Judge.

The above exchange makes clear that all attorneys were aware of the importance of the time of shooting to the outcome of the case. During the evidence phase of trial, defense counsel tried twice unsuccessfully to get before the jury the alternative time of shooting. First, during cross examination of Missouri State Highway Patrol Sergeant Scott Stoelting, one of the case investigators, the following exchange occurred:

> Q. [by defense counsel Rantz] [sic] Okay. You had mentioned that you can't attest that you read all the reports-
> A. That's correct.

6

. . . .

Q. At any time did you have any information as to any witnesses to the time of death?

A. There were some witnesses that were identified that heard a gunshot at a certain time in the morning.

Q. Multiple witnesses?

A. I don't remember how many.

Q. More than one?

A. There were more than-

MR ZOELLNER: I'm sorry[,] Sergeant Stoelting. I don't mean to interrupt you, but Judge, can we approach about something?

[AT BENCH]

MR. ZOELLNER: Judge, I'm going to object that any of this testimony is being offered as trying to get a time of death that's different than what the State has called, is hearsay. I don't know if this officer read these reports or not . . .


. . . .

MR. ZOELLNER: It's being offered Judge -- to say that there's multiple information, there's different information, they're trying to put in hearsay statements to be offered for the truth of the matter so that can - like they said in opening statement, which they denied they were going to do, and now they're doing it. It's hearsay. It's being offered for the truth of the matter. It's actually double and triple hearsay.


. . . .

THE COURT: To ask about different times, I would sustain that objection.

Second, later in the same examination of Sgt. Stoelting the following exchange occurred:

MR. ZOELLNER: When you got out there the information you had from the officers from Denise was that two shots had been fired?

A. Yes[.]

MR. RANZ: Hearsay within hearsay, Your Honor.

THE COURT: Overruled. I've already allowed that in. Let's move on.

7

. . . .

[AT BENCH]

MR. RANZ: Your Honor, you just allowed in testimony, information that this officer received from another officer. You already sustained the state's objection as to-- if I were to ask if there were different times and what those times were, which is the same question here. It is another officer receiving information from another officer.

THE COURT: All right. And your point is?

MR. RANZ: I believe that I can ask a question if there were different times of this witness and this witness knew what those times were.

. . . .

MR. ZOELLNER: No Judge --

THE COURT: . . . I'm sustaining the prior objection.

Finally, the importance of the time of shooting is shown by the emphasis that the State gave the issue during closing argument. Josh Harrel for the State argued:

But in considering whether or not this was an accident, the other thing to look at - possibly more important - is the timing of the events that you heard. The shot that killed Ralph Hanna was fired at almost exactly 8 o'clock in the morning of November 16, 2003. Remember Donald Fann. He was sitting in his house watching his news program. He's got his three Dale Earnhardt clocks and he hears a shot. . . . And when he heard that shot, his clocks were straight up 8 o'clock or very close. The news program that he was watching started at 8 o'clock was just coming on. The shot that killed Ralph Hanna was fired at 8 o'clock.

Now fast forward. When did the calls for help go out? We know from the statements that Denise Hanna made that she was . . . home when all of this happened. So when did she call for help? . . . That time is 40 minutes after the fatal shot is fired. . . . Why did she wait 40 minutes to call for help? Because it wasn't an accidental shooting. She wasn't standing in her kitchen and saw a stray bullet hit her husband. She would have called for help right away. Who wouldn't have? She needed time.

. . . .

So where was this defendant that morning? We know from Kristin Eads that he left about 5 o'clock that morning, right before her grandfather clock chimed. And no one has been able to say with certainty

8

that they saw him until he gets back to Kristin Eads' home around 9 o'clock.

. . . .

So what happens next that morning? What was Denise Hanna doing during the time between when Ralph was killed and when she started calling for help, that 40 minutes? . . . Well, again we can go to Michael Cates . . . And Mr. Cates testified . . . he thought it was around 8:15, 8:30 that morning; right in the window between when Ralph Hanna was killed and when Denise Hanna called for help. . . . Dropping someone off at the defendant's car, in the window of time between when Ralph Hanna was killed and Denise Hanna called for help.

The motion court found that Movant's trial counsel failed to interview, investigate and subpoena Ms. Black as a witness and, in the process, deprived Movant of an important and viable defense. The jury only heard the witness for the State that the shot that killed Ralph Hanna was fired at 8:00 a.m. The jury did not hear that the shot was fired at 8:30 a.m. because Movant's counsel did not interview Ms. Black, did not contact her, and did not call her as a witness, despite knowing of her existence and what her testimony would be. The motion court found no strategic reason, sound or otherwise, for failing to investigate, interview, and subpoena Ms. Black and that Movant was prejudiced. The court found that there was a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

We review the motion court's rulings to determine whether the findings and conclusions of the trial court are clearly erroneous. *Rotellini v. State*, 77 S.W.3d 632, 634 (Mo.App. E.D. 2001). Upon review of the entire record, we must be left with a definite and firm impression that a mistake has been made. *Id.* We are not left with such a definite and firm impression. The State does not argue that trial counsel was effective, rather, the State argues that the testimony of Ms. Black would not have changed the result

9

of the trial because of the overwhelming evidence of guilt. In making that argument, the State relies upon the "far more credible testimony of a neighbor" who testified that the shot was fired at 8:00 a.m. The State's argument misses the mark. The point of the motion court's ruling was that the jury only heard one side as to the time of the shot and that timing was critical. It was for the jury to determine who was "more credible" at the trial. The State then points to Movant's actions as "consciousness of guilt" as part of the overwhelming evidence necessary to make a finding of no reasonable probability of a different result. Again, the State misses the mark. If the jury had been presented with and believed that the shooting occurred at a different time, the inference that Movant's actions showed a consciousness of guilt would not necessarily have followed. For instance, the State notes that Movant refused to tell his girlfriend's mother about the event. If Movant did not commit the murder, then it would be hard for him to tell his girlfriend's mother anything about the event. Although the State points to several circumstantial events that could be used to convict Movant, the fact remains that the motion court found that a critical and contrary piece of evidence was not given to the jury at the trial of Movant. We cannot find that the motion court clearly erred in that finding. The judgment is affirmed.

Nancy Steffen Rahmeyer, J. – Opinion Author

Gary W. Lynch, P.J. – Concurs

William W. Francis, Jr., J. – Concurs